UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,     .
                              .
          Plaintiff,          .    CR No. 21-0699 (JDB)
                              .
     v.                       .
                              .
                              .    Washington, D.C.
01 JOLY GERMINE,              .    Monday, January 8, 2024
02 ELIANDE TUNIS,             .    2:10 p.m.
                              .
          Defendants.         .
. . . . . . . . . . . . . . . . . .

PRETRIAL HEARING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          KAREN P. SEIFERT, AUSA
                             KIMBERLY L. PASCHALL, AUSA
                             U.S. Attorney's Office
                             601 D Street NW
                             Washington, DC 20530

                             BEAUDRE D. BARNES, ESQ.
                             U.S. Department of Justice
                             950 Pennsylvania Avenue NW
                             Washington, DC 20530

For Defendant Germine:       ALLEN H. ORENBERG, ESQ.
                             The Orenberg Law Firm, PC
                             12505 Park Potomac Avenue
                             6th Floor
                             Potomac, MD 20854

                             ELITA AMATO, ESQ.
                             2111 Wilson Boulevard
                             Suite 8th Floor
                             Arlington, VA 22201

```
For Defendant Tunis:              ROBERT C. BONSIB, ESQ.
                                  MarcusBonsib LLC
                                  6411 Ivy Lane
                                  Suite 116
                                  Greenbelt, MD 20770

Court Reporter:                   BRYAN A. WAYNE, RPR, CRR
                                  U.S. Courthouse, Room 4704-A
                                  333 Constitution Avenue NW
                                  Washington, DC 20001
```

1             P R O C E E D I N G S

2         THE DEPUTY CLERK:  Good afternoon, Your Honor.  We're

3    on the record in criminal case 21-699, United States of

4    America versus Defendant 1, Joly Germine, and Defendant 2,

5    Eliande Tunis.  Defendant 1, Joly Germine, is not in the

6    courtroom, for the record.

7       Starting with government counsel, may you please approach

8    the podium and state your appearance for the record.

9         MS. SEIFERT:  Good afternoon, Your Honor.  Karen

10   Seifert for the United States.  With me at counsel table is

11   Kimberly Paschall and Beau Barnes.

12        THE COURT:  Good afternoon to all of you.

13        MR. ORENBERG:  Good afternoon, Your Honor.  Allen

14   Orenberg on behalf of Mr. Germine, accompanied of course by

15   Ms. Amato.  And for the record, we are not waiving our

16   client's presence for the purpose of this hearing, and we

17   would like permission -- when I say "we," me and Ms. Amato --

18   to approach the bench ex parte.

19        THE COURT:  All right.  I'll give you that opportunity

20   in a moment.  Let's get all the introductions in and decide

21   what we're going to be doing.

22        MR. BONSIB:  Good afternoon, Your Honor.  Robert Bonsib

23   on behalf of Ms. Eliande Tunis, who is present.

24        THE COURT:  All right.  Now, Mr. Germine is not here.

25   The reason he is not here, as represented to me, is that he

1     was at first declining to leave his cell this morning and then

2     -- I'll use the term very broadly in quotation marks --

3     "fighting" with those who were trying to get him ready to come

4     to the courthouse for the come-up and this proceeding.  That's

5     the representation as made to me.

6          MS. SEIFERT:  Your Honor, I just wasn't sure if we

7     needed the translator, if Ms. Tunis needed the translation

8     or not.

9          THE COURT:  My understanding is she does not, but

10    Mr. Bonsib, why don't you --

11         MR. BONSIB:  She speaks fluent English, Your Honor.

12         THE COURT:  Thank you.

13    So that's the representation made to me.  And Mr. Orenberg

14    has indicated that he's not waiving Mr. Germine's presence for

15    purposes of what he called this hearing.  It's actually a

16    pretrial conference, but it could turn into a hearing on some

17    motions, and some motions have recently been filed that I

18    might be asking some questions about.

19    So with that, is your request to approach ex parte related

20    to this specific issue, Mr. Orenberg?

21         MR. ORENBERG:  Yes, Your Honor.  The issue of

22    Mr. Germine.

23         THE COURT:  All right.  Well, why don't I let you come

24    up, and we'll turn the husher on and you can make the

25    representations that you wish to make to me.

1        (Sealed ex parte conference.)



6





1  ████████████████████████████████████████

2  ████████████████████████

3  ████████████████████

4  ██████████████████████████████████████████████████

5  ██████████████

6  ████████████████████████████████████████████

7  ██████████████████████████

8  ████████████████████████████████

9  ████████████████

10      (End of sealed ex parte conference.)

11          THE COURT:  All right.  The discussion I've just had

12   is going to remain under seal.  I'm now going to pause these

13   proceedings for -- I hope it'll only be two or three minutes

14   while Mr. Orenberg and Ms. Amato have some discussion with

15   government counsel and Mr. Bonsib to bring you up to whatever

16   speed he's comfortable bringing you up to.

17      (Counsel conferring.)

18          THE COURT:  All right.  We're back on the record.

19      Mr. Orenberg?

20          MR. ORENBERG:  Your Honor, we are still declining to

21   waive our client's presence for purposes of this pretrial

22   conference/possible hearing.  I think the government has a

23   position they'd like to represent to the Court.

24          THE COURT:  All right.  Let me hear the government's

25   position.

1          MS. SEIFERT:  Thank you, Your Honor.  Our reading of

2     Rule 43 is that the defendant's appearance is not required for

3     today's pretrial conference.  43(a) says defendant's presence

4     is required at the initial appearance, the initial

5     arraignment, the plea, at every stage of trial including the

6     jury impanelment and the return of verdict and at sentencing.

7          43(b) says the defendant need not be present under the

8     following circumstances:  And (b)(3) says conference or

9     hearing on a legal question when the proceeding involves only

10    a conference or hearing on a question of law.  And we think

11    today's proceeding falls squarely within (b)(3) and therefore

12    the court can find that we can continue without the defendant

13    being here.

14          THE COURT:  I'm going to have real trouble concluding

15    this since I've turned accidentally to the rules on appellate

16    procedure.

17         All right.  So your position is that this proceeding comes

18    under what provision of Rule 43?

19          MS. SEIFERT:  (b)(3), conference or hearing on a legal

20    question.

21          THE COURT:  So a pretrial conference, you think, is

22    only on legal questions?

23          MS. SEIFERT:  Well, I don't think necessarily --

24          THE COURT:  I'm going to be talking with you about

25    witnesses, about jury selection, about exhibits because I

1    haven't seen your exhibit list and witness list, which I

2    assume were provided at ten o'clock this morning or by that

3    time --

4        MS. SEIFERT:  They were, Your Honor.

5        THE COURT:  -- to the defense.  It sounds like it's

6    going to be potentially a little bit more than a legal

7    question.

8        MS. SEIFERT:  So I don't read hearing on a legal

9    question.  I read that it's two things, conference or a

10   hearing on a legal question.

11       THE COURT:  Oh, now we're going to get into that issue.

12       MS. SEIFERT:  But up until now, I did not know that the

13   defendant was not having his presence waived.  So I will say

14   that I don't have other cases for you right now.  If it's a

15   hearing -- I mean, if we're arguing motions or legal issues, I

16   think that sounds like what a conference is or a hearing on a

17   legal issue, so I think we would be well within the rule.

18       If it's a question of whether we're sort of venturing into

19   an uncertain territory because we don't have all -- maybe

20   there's not a ton of case law on this, I think the court could

21   find that the defendant has purposefully absented himself from

22   the proceeding, which of course if it comes down to this at

23   trial, the court can also make that finding and we can

24   continue without him.

25       But I do think the court is well within its power to find

1  that either the defendant is not required or that to the

2  extent that this falls under a stage of trial, under (A)(ii),

3  that the defendant has purposely absented himself.

4      THE COURT:  All right.  I'll hear from Mr. Orenberg if

5  he wants to respond.

6      MR. ORENBERG:  Your Honor, it's my understanding that

7  Rule 43 requires a defendant to be present at every

8  significant stage of the proceedings including the initial

9  appearance, initial arraignment, the plea, every trial stage

10  including jury impanelment and the return of the verdict and

11  sentencing.

12      THE COURT:  This isn't a trial stage.  This is a

13  pretrial stage.

14      MR. ORENBERG:  No, I understand that.  I understand

15  that.  And then the government -- but it's important to my

16  client.  I mean, he's facing very serious charges, very

17  serious allegations, and he has a right to be here.  For the

18  reasons that I enunciated to the court ex parte under seal at

19  the bench, I'm not so certain that he has voluntarily absented

20  himself from today's proceedings.  That's all I'll say on that.

21      THE COURT:  All right.  Here's what we're going to do.

22  First of all, when I look at Rule 43, there is no clear

23  answer.  I've dealt with this some in my capacity as chair of

24  the standing committee on the federal rules, and particularly

25  during the Covid pandemic, but the language of (b)(3) says the

1    proceeding involves only a conference or a hearing on a

2    question of law, which sends somewhat of a signal that it's

3    a narrow, limited category that they're excluding from the

4    defendant needing to be present.

5        In any event, I think we can do some things here today

6    without running any risks under Rule 43 or otherwise with

7    respect to the defendant's -- Mr. Germine's presence.  But I

8    don't think we can do everything, perhaps, that we were going

9    to do.  But I do want to get a sense, and maybe we'll have to

10   reschedule part of this pretrial conference for later this

11   week, but we don't have a lot of time between now and our

12   scheduled trial date on Wednesday.

13       So we're going to do a little bit of something here today.

14   So let me start by just making sure that there's no

15   anticipated change -- other than this event that we're talking

16   about, there's no anticipated change to the need to go to

17   trial against both defendants on Wednesday, January 17.  Is

18   that correct?

19           MS. SEIFERT:  Not from the government.

20           THE COURT:  Not from the government.

21       Are there any anticipated changes for any other reason from

22   either of the defendants?

23           MR. ORENBERG:  On behalf of Mr. Germine, subject to

24   what was discussed at the bench ex parte under seal, something

25   may or may not happen.  There may be an unanticipated change.

1          THE COURT:  Well, okay.  Unanticipated is not what I'm

2    asking for.  I'm asking is there any likely change that you're

3    thinking of.  Are there plea discussions going on?

4          MR. ORENBERG:  No, Your Honor.

5          THE COURT:  Okay.

6          MR. ORENBERG:  If the court's focus is on that, no.

7          THE COURT:  Okay.  And, Mr. Bonsib, same situation?

8    Just so I'm ready for what we need to be ready for.

9          MR. BONSIB:  As far as I know, Your Honor, we have not

10   received any plea offer from the government, so we are not in

11   a position at the moment to respond.  Hopefully, if they make

12   something and it's going to change, we'll let you know.  But

13   right now that hasn't happened.

14         THE COURT:  All right.  I suppose that throws the ball

15   back in the government's court a little bit.  I don't get

16   involved in plea discussions.  I don't want to get involved in

17   any to any extent, but the fact that Mr. Bonsib has indicated

18   there has been no plea offer made would indicate to me that I

19   should at least ask the government whether it intends to make

20   a plea offer.

21         MS. SEIFERT:  There were plea offers made to Ms. Tunis

22   earlier in the case that are no longer on the table, and we

23   were recently re-approached and asked if there would be

24   another offer on the table, which we're discussing.  But as I

25   explained to Mr. Bonsib, any offer from the government at this

1    juncture would require both defendants to resolve the case,

2    which I think is highly unlikely at this juncture.  And so

3    the government is happy to discuss that with both counsel but

4    anticipates that we'll be starting trial next Wednesday.

5            THE COURT:  All right.  And I will anticipate the same

6    thing.  Still a three-week estimate from the government?

7            MS. SEIFERT:  Yes, Your Honor, including picking the

8    jury, I think.  We know Your Honor is very speedy.

9            THE COURT:  One day for picking the jury?

10           MS. SEIFERT:  Yes.

11           THE COURT:  All right.  We will sit all days.  I'm not

12   taking any days off once we start, no Fridays off, because it's

13   not a long enough trial to warrant that, and the first Friday

14   would only be two days after we start.  So we won't be taking

15   any days off.  And trial will be 9:30 to 5:00, generally

16   speaking, with a lunch break and one morning and one afternoon

17   break.

18       I'm pretty rigid in that schedule.  I try to get going at

19   9:30 or very close to it so the jury's not sitting around

20   waiting.  And for that reason, I require that if there are

21   issues to be raised, that they be raised by eight o'clock in

22   the morning and that we get together at nine o'clock in the

23   morning to address those issues that need to be addressed for

24   the day's proceedings so that we can begin hopefully at 9:30.

25   I only adjust the five o'clock by minutes if necessary to

accommodate a witness and keep a witness from having to come
back if we can finish up quickly or to accommodate the jury if
the jury wants to stay longer for some reason.

Jury selection.  We'll be looking for a jury of 12 with two
alternates unless I hear any reason that we should deviate
from that pretty standard practice in this court.  That would
mean that we need to get 32 jurors because it will be six
peremptories for the government, 10 for the defendants jointly,
and then another one for each side for the alternates.

The first question will be, will the defense counsel be
able to coordinate sufficiently on exercising their 10
peremptory challenges?

MR. BONSIB:  Yes, Your Honor.

MR. ORENBERG:  Yes, Your Honor.

THE COURT:  I will leave that to you.  I will not say
5 and 5, I will say jointly, and you can coordinate that.
And that will be true for the one alternate strike as well.

The process is we use the cards to do the voir dire
questions and then bring the jurors up one by one for
follow-up questions.  We'll do it in the single courtroom.
We don't have the luxury of having multiple courtrooms any
longer, and we will plan on having everyone sitting here,
bringing a few jurors up -- potential jurors up to the jury
box and then bringing them up to the bench one by one with
counsel here.  And we'll have the husher available for when

1    personal things are delved into, but not completely.  This

2    will be an open proceeding for the most part.

3        So any questions about that process as envisioned?

4            MR. BONSIB:  If I may, Your Honor?

5            THE COURT:  Yes.

6            MR. BONSIB:  Does Ms. Tunis participate -- will she

7    have a headset --

8            THE COURT:  She should have a headset which will allow

9    her and Mr. Germine to be hearing what is being said when the

10   husher is on.

11           MR. BONSIB:  Thank you.

12           THE COURT:  I see puzzled looks on the government's

13   collective faces, but...

14           MS. SEIFERT:  I'm not aware of any precedent in this

15   court --

16           THE COURT:  You've tried cases before me before.

17           MS. SEIFERT:  I have with you, during Covid in fact.

18           THE COURT:  I'm not suggesting any erratically

19   different process.

20           MS. SEIFERT:  Afterwards, though, I did try a case

21   elsewhere in the courthouse with a different judge, and we

22   addressed the issue of whether having the juror at the bench

23   created a First Amendment issue because the audience could not

24   hear the juror's answers to the questions.

25           THE COURT:  The husher will only be on -- the juror

1  will only be brought up from there to here when it's something

2  that we have to turn the husher on first.

3  　　　　MS. SEIFERT:  Okay.  So otherwise the juror will be at

4  the podium?

5  　　　　THE COURT:  Probably at the podium.  Right.

6  　　　　MS. SEIFERT:  Okay.  Then no objections from the

7  government.

8  　　　　THE COURT:  And there is a First Amendment -- or it

9  hasn't been resolved in this circuit.  It hasn't really been

10  resolved for the most part in all the circuits nationally, but

11  there is a First Amendment argument that even the individualized

12  voir dire needs to be public, and my approach these days is to

13  have it be public except where it gets into some particularly

14  sensitive matter with that individual juror.

15  　　Mr. Orenberg.

16  　　　　MR. ORENBERG:  Your Honor, I would just raise the

17  concern given -- I guess the court can observe and we can all

18  observe the recent rise or increase of Covid again and RSV, I

19  think it's called.  If we call a prospective juror to the

20  bench and then the six of us run up there and huddle around

21  and we have the court staff and Your Honor, that may cause the

22  juror to be uncomfortable because of health concerns.  Maybe

23  there's some way the court can address ahead of time that

24  particular issue and conduct individual -- and if necessary

25  conduct individualized voir dire in a more open setting for

1    the comfort of that prospective juror.

2         THE COURT:  There's only two ways to do it that I know

3    of.  One is to use the jury room and to go back in the jury

4    room -- but that makes it non-public more generally unless you

5    go back every once in a while for a particular question that

6    winds up taking up a lot of time -- or using the telephone

7    husher system.  And if you're concerned -- and it's not an

8    irrational concern.  If you're concerned about the increase

9    particularly of Covid, not just RSV, then I will contemplate

10   using the telephone husher system, which will protect to some

11   extent from the collective -- close, collective activity.

12         MR. ORENBERG:  Right.  Okay.  Thank you, Your Honor.

13         MS. AMATO:  Your Honor, I have a question.  So I

14   haven't had a jury selection yet with this First Amendment

15   issue, and the last jury --

16         THE COURT:  Well, the First Amendment issue exists for

17   every jurisdiction.

18         MS. AMATO:  Well, I mean --

19         THE COURT:  No one's raised it, you mean.

20         MS. AMATO:  Yes.  In fact, the last jury selection voir

21   dire that I had in this courthouse in June, we handled

22   everything in the jury room.  And so my question is, handling

23   it this other way as proposed, how do we ask questions?

24   Usually we're permitted some leeway to ask some follow-up

25   questions, and if a juror or each juror is going to -- or

1    however it works, a juror will come to the podium, I'm not

2    sure how we are supposed to be able to ask --

3        THE COURT:  As long as you are very observant and

4    astute with respect to it for the court reporter's

5    convenience, you'll be using the microphones when I ask if

6    there are any follow-up questions from the attorneys, and

7    you'll use the microphones where you're seated.

8        MS. AMATO:  Okay.  I see.

9        THE COURT:  So that's how you'll ask follow-up

10    questions.

11        MS. AMATO:  And that will be open to the whole -- but

12    I guess the question is --

13        THE COURT:  The question will be open to all.  If I

14    decide that the answer might be a sensitive one, then we'll

15    put the husher on.

16        MS. AMATO:  Okay.  All right.

17        THE COURT:  Ms. Amato seems like she would prefer a

18    closed proceeding.

19        MS. AMATO:  I would.

20        THE COURT:  Ms. Seifert.

21        MS. SEIFERT:  I think we would say that the closed

22    proceeding could create a risk on appeal because it's not only

23    Ms. Amato's client, it's also Mr. Bonsib's client, and also

24    the public's right writ large.  So we're fine with the

25    proceeding as the court has laid it out and also with the use

1   of the telephone.

2         THE COURT:  And we'll see if we can't arrange to use

3   the telephone system because -- we've used it a lot recently.

4   We've used it a lot, obviously, during the Covid pandemic,

5   although not for trials because we weren't doing trials for

6   the most part in that setting.  But at the end of it we were,

7   and it works pretty well.  So we'll see if we can't use that

8   as our safety feature.

9         MS. AMATO:  So then I have another question.  In terms

10   of our challenges, how is that handled, then, if we're in an

11   open forum?

12         THE COURT:  Again, we'll have to do it by the husher

13   system, with the telephones.  And after each individual juror,

14   the questioning is finished, I will pause and that will be

15   your opportunity to indicate if you have an objection to that

16   juror or wish to strike that juror.  And if so, then we will

17   put the husher on to hear it from you.

18      All right.  We'll do the regular jury with your 6 and

19   10 and wind up once those are exercised.  If there are no

20   overlaps, we'll reduce the 32 down to 16.  And then the first

21   12 will be the jury, the last four will be the alternate pool,

22   and you'll each have one strike to exercise with respect to

23   that alternate pool.  And then I will seat the alternates not

24   in the last two seats, and I'll tell you in advance which

25   seats they'll be in.

1          MS. SEIFERT:  Could the court repeat that, please?

2          THE COURT:  Sure.  So you start with 32 jurors.  You

3     exercise your peremptories on the jury itself.  That's 16.

4     Would reduce it down to 16 remaining jurors.  The first 12 of

5     those will be our jury.  The last four will be the alternate

6     pool.  You'll each then exercise that last single peremptory

7     strike for the alternates, and that will reduce us down to the

8     two alternates.  Those two alternates will be seated not in

9     the last two seats, 13 and 14, but in two other seats on the

10    jury so that the jury is not aware of who the alternates are,

11    although you will be aware of it.

12         MS. SEIFERT:  Put differently, if I might ask, the

13    court doesn't seat the box and then do the alternate strikes,

14    right?  Everyone's sitting there the whole time, and we'll do

15    all the strikes, and then we'll seat the box after it's all

16    over?

17         THE COURT:  Correct.

18         MS. SEIFERT:  Thank you.

19         THE COURT:  All right.  Voir dire, I'm essentially done

20    with voir dire.  I'll make sure that you get a set of the voir

21    dire questions this week.  Jury instructions, I've got a lot

22    of work to do on the jury instructions.  So I'll provide the

23    preliminary jury instructions at the end of the week, but I

24    don't think we'll be finished with the jury instructions until

25    sometime even after the start of the trial.

1        All right.  So the -- there are these motions.  Now, under

2   Rule 43, as the government views it, those are legal

3   questions, and we can discuss those motions.  I will say this:

4   I don't have any discussion that I'm prepared to engage in

5   with respect to the motion for witnesses to testify using

6   pseudonyms, other than to ask the defense whether they intend

7   to file an opposition to that motion.

8        MS. AMATO:  Your Honor, I'm not sure if we will file an

9   opposition, but we would like a chance just to look at the

10   case law again.  I have had a case previously in this

11   courthouse where pseudonyms were used, and Juan Valdez showed

12   up without his coffee, but he showed up as a witness -- joke.

13       Anyway, but I would ask the government to provide us --

14   they have provided us the names of their witnesses, and now in

15   their motion they have listed them as witness 1, witness 2,

16   witness 3, witness 4, as individuals who they would like to

17   use pseudonyms.

18       I would just ask that the government match up who on their

19   witness list is witness 1 and witness 2, witness 3, witness 4,

20   because the list -- I understand that the witnesses are

21   probably not law enforcement and it's probably from their

22   civilian list, but I would at least like to know which of the

23   names on the civilian list are those witnesses.

24       MS. SEIFERT:  Your Honor, after I filed the motion, I

25   sent counsel a copy of the filing and then also notified them

1    that in the motion each of the names of the witnesses that

2    corresponded to 1, 2, 3, and 4.  And then Ms. Paschall sent

3    that again this morning.

4        Additionally, on our witness list, we've put an asterisk

5    next to each of the civilian witnesses that are the subject of

6    the motion.  So -- but I'm happy to talk with counsel after if

7    it's still unclear.

8            THE COURT:  But you think you've already provided it?

9            MS. SEIFERT:  Yes.

10           THE COURT:  All right.

11       On the other motion, I have the motion; I have an

12   opposition.  I have a few questions for each side, and I think

13   under Rule 43 we can probably proceed even though Mr. Germine

14   is not present, although you have not waived his presence,

15   because these are just questions for counsel.

16       I guess I would start with the government.  It's not clear

17   to me what the government -- what knowledge the government has

18   with respect to files.  Has the government checked?  Has the

19   government reviewed files?  Why does the government have no

20   reason to believe that the cooperating witnesses currently

21   subject to any immigration proceedings, unless you've checked,

22   and why does the government -- well, I guess I'll stop there.

23           MS. SEIFERT:  Your Honor, the cooperating witness came

24   to the United States with his family when he was 18 years old

25   and has been living here and working here legally under that

1    immigration adjustment since that time.

2            THE COURT:  "That time" is how long ago?  Yesterday

3    or...

4            MS. SEIFERT:  Twelve years, I think.

5            THE COURT:  Okay.  Thank you.

6            MS. SEIFERT:  I'm just blanking right now.  I believe

7    he's 30 or 32.  And so we have no information from the

8    cooperating witness that his immigration status was anything

9    other than legal up until the time in which he was arrested.

10   Under the plea agreement, which defense has, there are

11   immigration consequences to the plea, and those are all

12   discussed in the plea.

13       And, of course, the cooperator can be cross-examined on

14   that, as they often are, but specifically the plea agreement

15   requires the cooperator to admit that he's presumptively

16   removable on the basis of the plea and to waive any claims

17   with the exception of a Convention Against Torture claim,

18   which is sort of the only claim which is not waivable, right,

19   because it's in the future, you might have a fear of torture.

20   So that's the standard of our cooperation pleas when an

21   individual is not a U.S. citizen, which this individual is

22   not.  So they're a U.S. person but not a naturalized citizen.

23       So based on all the information we have in dealing with

24   this cooperator himself --

25           THE COURT:  But it all comes from the cooperator?

1          MS. SEIFERT:  Yep.  And also, on our understanding

2     of how immigration proceedings work when an individual who

3     is not a national but who's lawfully in the United States is

4     arrested, we have no reason to believe that there's any

5     pending immigration proceeding of any kind, nor have we been

6     notified by the Department of Homeland Security that there is

7     a pending immigration proceeding.

8          And typically, it's our understanding that the process is

9     that an individual is sentenced, serves their time, and then

10    at the end of the time period of the service of any jail time,

11    they would then transfer to the custody of the Department of

12    Homeland Security where then the immigration issue is

13    adjudicated.

14         So I don't know when that will be because the court has not

15    sentenced the cooperating witness, but it is sometime in the

16    future and the government doesn't have any information that at

17    present there are any pending immigration proceedings.

18         We received request from defense, I believe it was on

19    Friday, for this information.  We have not queried the

20    Department of Homeland Security to know if there's a file, and

21    frankly I don't think the government is required to do that.

22    I don't think the government in the normal course does that.

23    I have not seen us do that in any of my trials or my

24    cooperating witnesses in district court in the time that I've

25    been in the office.  It's certainly not our office's policy.

1    Our response was reviewed by our supervisors in the

2    national security section, who agree that it is not the

3    government's obligation to obtain files from another agency,

4    including DHS, and that the defense has not explained why

5    those would be relevant in any event, because of course the

6    DHS proceeding is clearly laid out in the plea, is completely

7    one that the Department of Justice has no control over.  In

8    fact, that's exactly what it says:  We're not going to be

9    able to help you stay in the country; you're agreeing you're

10   presumptively deportable.

11   So we think that the defense at present with the plea

12   agreement has the information that it needs to be able to

13   cross-examine the cooperator's motivations, and if the

14   court -- I mean, I suppose what defense could have done or

15   should do is ask the court I guess to issue a trial subpoena

16   for that material if the court finds that that material is

17   somehow relevant.

18   But I don't think it's the government's obligation to go

19   get those files when the government has no reason to believe

20   they're there, the government has no understanding about why

21   those files would be relevant, defense hasn't argued that

22   those files would be relevant, and the DHS is not part of the

23   prosecution team.

24       THE COURT:  All right.  Thank you.

25   So to -- would it be Ms. Amato?  Are you responsible for

1    the motion?

2         MS. AMATO:  Yes, Your Honor.

3         THE COURT:  So do you have any argument that you'd like

4    to make beyond the fairly bare-bones motion with respect to

5    the purpose that is behind seeking these files?  What is the

6    likely or possible relevance?

7         MS. AMATO:  So, Your Honor, the relevance would be

8    for impeachment material.  And in the case that I cited in

9    my pleading, we actually -- well, we asked to view the

10   immigration files, and at that time we knew sort of in advance

11   who the witnesses would be.

12        THE COURT:  Is this the Judge Brinkema case?

13        MS. AMATO:  No.  The Judge Brinkema is a different

14   case, but I can get to that one.  No, it was in a case in

15   front of Judge Xinis.  And so the prosecution invited us to

16   their offices, and on two different days we went in and we

17   were presented with all of the immigration files for each of

18   their cooperators.  And we were able to review them fully, and

19   then with sticky notes or other ways we were able to identify

20   any pages that we wanted copied, and then we were provided

21   copies of those pages that we requested.  And quite frankly,

22   there was impeachment material in there --

23        THE COURT:  All right.  Just because the prosecutors

24   did that in that case and there was impeachment material, why

25   in this case do you think there is relevant material,

1    something that would be relevant and material to your defense?

2          MS. AMATO:  Right.  And I'm not saying these people

3    maybe are not legally here.  It's not that I'm saying that

4    they're illegally here.  I'm not questioning that aspect of

5    it.  But I have seen in the past where just because someone is

6    legally here doesn't mean that they are not continuing to seek

7    changes in adjustment of their legalization.  I don't believe

8    this individual is a citizen, so he may have filed something

9    recently seeking citizenship, he may have filed something

10   recently for asylum, which I've seen in some of the other

11   proceedings.

12        Sometimes there's information in there where they don't

13   include, when they're required to, pending cases such as this

14   case which would be relevant to show that -- relevant to their

15   truth and veracity.  I mean, that's where these things have

16   come in.

17        The case before Judge Brinkema, it was actually before a

18   different judge initially, and in that case the cooperator

19   testified we did not have the immigration files.  We requested

20   the files.  The witness --

21          THE COURT:  There was some connection, some immigration

22   connection in that case, but there really isn't here.

23          MS. AMATO:  Well, I think there is, because I believe

24   that this witness is going to seek assistance from the

25   government for himself and his family to be able to reside in

1    the United States.  I think one of the bases is going to be

2    he's going to argue, if he hasn't already done so in some form

3    or fashion with immigration, that he fears for his life.  And

4    so maybe there is an asylum petition he's already started.

5    But I think there is, and I believe the government is going to

6    help him if they haven't already, and I'm sure there's been

7    discussions about that.

8        THE COURT:  So that would mean that in every criminal

9    case where it's not a citizen and there might be immigration

10   files that the defense would be entitled to have the

11   government go and check and see if there are such files, and

12   if there are, to produce them to the defense?  Because you

13   haven't given me anything to indicate that in this case

14   there's a unique circumstance other than what would be true

15   for every case in which someone who could possibly have some

16   immigration proceeding was a cooperator.

17       MS. AMATO:  Correct.  I mean, we've heard the

18   government is trying to hide the names of certain witnesses

19   who still do business in Haiti.  So I can imagine that this

20   witness, just like those witnesses, would have a clear and

21   potential danger to return back to Haiti based on similar type

22   of assertions that the government put in their motion for

23   those witnesses.

24       So I would see in this case in particular -- and I believe

25   the government, they may have already provided us some

1    notification that they have assisted with the relocation of

2    the witness's family to the United States, but I don't recall

3    specifically if that's what I read somewhere.  So that may

4    already be occurring in this case.

5              THE COURT:  Okay.  So anything else you want to say

6    with respect to the purpose or the rationale?  And is there

7    any reason that I shouldn't accept the government's

8    representation with respect to these individuals as to whether

9    there's likely to be or not to be any current immigration

10   proceedings or paperwork?

11             MS. AMATO:  I don't --

12             THE COURT:  For example, if there isn't anything for

13   the individual that we're talking about a moment ago, if there

14   isn't anything over the last 10 years, why would you be

15   entitled to it?

16             MS. AMATO:  Right.

17             THE COURT:  Why would you be entitled to something from

18   10 years ago?

19             MS. AMATO:  Well, two things.  One, I want to state

20   that I don't believe the government knows for sure that there

21   hasn't been anything recently.  Number one.

22             THE COURT:  Well, I'm asking whether you think I should

23   accept the government's representation based on --

24             MS. AMATO:  And I'm not saying that they're not

25   providing what they believe.  I don't believe I've had the

1   information from the witness.  I don't believe they've reached

2   out to the witness or to immigration to determine the answer

3   to that.

4        And so I would say that my request is a little bit more

5   attenuated if all we have is -- if the witness has only

6   handled immigration matters 10 years ago versus if he's done

7   something more recently.  I appreciate that, what Your Honor

8   is distinguishing, but at this point I don't think we know the

9   answer, really.

10            THE COURT:  All right.  Anything else?

11            MS. AMATO:  No.

12            MR. ORENBERG:  Your Honor, one moment.

13        (Counsel conferring.)

14        MS. AMATO:  Yeah, that's right.  And my co-counsel

15   reminds me, number one, we were just provided the information

16   of this -- the identity of this witness as being a cooperator

17   the government intends to call.  So that's why we have not

18   been able to subpoena.  And quite frankly, I don't know --

19   again, because it's with a government agency, I don't know if

20   they'd even accept our subpoena or if we'd have to ask for a

21   FOIA request.  So it would be extremely difficult, cumbersome,

22   and time-consuming, and that's why we've requested the

23   government, because it's much easier for them to reach out to

24   another government agency for the cooperator.

25            THE COURT:  In all likelihood, a subpoena would lead to

1    the same kind of proceeding before me as to whether it would

2    be enforced or not.  It seems to me the same kinds of

3    questions would be on my mind when the subpoena was brought

4    before me as are on my mind now.  So I'm not sure that, oh,

5    you can go subpoena it is really an answer.  It would just get

6    us four days from now to the same situation that we're at

7    right now.  But I'll hear anything further that the government

8    wants to say.

9         MS. SEIFERT:  I think there are two distinct issues.

10   One is, is the government required to go get the records, and

11   the other is, are the records even relevant.

12       I think the government is not required to obtain records

13   that are not from the prosecution team, and no one is alleging

14   that these records are from the prosecution team.

15        THE COURT:  No.  There's a split of authority within

16   this courthouse on that question.  There are some judges who

17   view the obligation pretty broadly in terms of the government

18   team.  Basically, they say any government agency.  And there

19   are other judges that are a little more circumspect with

20   respect to what is the government's team --

21        MS. SEIFERT:  I think most of those requests,

22   Your Honor, or disputes about who was on the prosecution

23   team came up when there was at least a colorable basis to

24   assert that that government agency had some role in the

25   investigation.

1      Here we're talking about a government agency that has

2      literally no role in this investigation.  There's no

3      relationship between what that agency does and this

4      investigation.  So I think --

5          THE COURT:  I'll remind myself by looking at Judge

6      Friedman and Judge Robertson's decisions too see exactly what

7      the connection was.  One of them I think involved the postal

8      service.

9          MS. SEIFERT:  But I think the other issue -- I mean, I

10     litigated this issue in Blackwater with Judge Lamberth and did

11     lose -- and actually lost in part because the court found that

12     the State Department in that case had exercised some control

13     over the investigation and therefore was part of the team, and

14     we did have to go get those records.

15         So it would be one thing if there was some nexus between

16     these files, if they exist, at DHS and this case, but these

17     are totally unrelated.  And a finding here or by anywhere in

18     this courthouse saying that the government in every case in

19     which we have a cooperating witness is now obligated to go get

20     the immigration files for a presumptive immigration proceeding

21     that's going to happen sometime in the future after the

22     defendant serves his sentence and is removed to DHS custody,

23     I mean, it just seems to me that that can't be the answer.

24         But let's just put that aside anyway and talk about

25     relevance, because the relevance argument just doesn't make

1    sense to me.  Let's just say the cooperating witness did put

2    in last year an asylum application or an adjustment

3    application.  Then the cooperating witness took a plea with

4    the United States government in which he swore that he was a

5    presumptively deportable person and which he said that he had

6    no claims left, he would bring no more claims, and the only

7    claim he has left is a Convention Against Torture claim.  And

8    that's what the plea says.  So why are any of those records

9    relevant?  I mean, I guess the only thing --

10    THE COURT:  I'll play the game and be devil's advocate

11    playing defense counsel:  They're relevant because they want

12    to see what statements he made and if everything that he said

13    in that proceeding was truthful so that they can impeach him,

14    potentially.

15    MS. SEIFERT:  But we don't even have a factual basis to

16    believe there is a proceeding at all, right?  Like it would be

17    one thing if the government knew --

18    THE COURT:  That's a different argument.  That's

19    different than the --

20    MS. SEIFERT:  But one of the questions we're asking,

21    the court is inquiring is, is it relevant and what is the

22    likelihood of there being relevant material.  And here we have

23    no assertion that there is relevant material at the Department

24    of Homeland Security.  So I think it would be --

25    THE COURT:  You mean no assertion that there is a

1    timely -- something within a reasonable period of time,

2    immigration proceeding, that potentially could include

3    relevant material?

4         MS. SEIFERT:  Exactly.  And it would be different if

5    the government had inquired of its cooperating witness and the

6    cooperating witness had said, oh, I'm in the middle of this

7    proceeding over here, and then maybe those would be statements

8    and maybe we'd want to get those statements for our own selves

9    and we would request them.  And then if the files clearly are

10   within the government's possession, which I don't know, but

11   I'm guessing with Judge Xinis and Brinkema they may have been

12   already in the government's possession at the time in which

13   those AUSAs provided those files, I don't know.

14     But I've reviewed the citations from counsel, and there's

15   no record that explains why either of the judges ordered that.

16   There's no even factual basis to understand why it was

17   ordered.  So I'm at a loss to be able to really defend against

18   those two judges' opinions in those two cases which frankly

19   seem more of a one-off than the practice.

20     It does not strike me that the law supports that it's the

21   government's obligation when it has done a fair inquiry of its

22   witness, has no information that the witness has a pending

23   proceeding in front of another government agency, to then go

24   out and obtain records of that other government agency when

25   that may or may not exist when that agency is not part of the

1    prosecution team.

2            THE COURT:  All right.  Thank you.

3        Ms. Amato, before Mr. Bonsib says something, I'll give you

4    the last word on your motion, and then if Mr. Bonsib wants to

5    say something, I certainly will hear from him.

6            MS. AMATO:  So in the Judge Brinkema case, that witness

7    had testified in the trial -- the first trial, which was not

8    before Judge Brinkema, there were several defendants.  One of

9    those defendants was severed out.  Then that defendant went

10   before Judge Brinkema.

11       So in the first trial, the cooperator testified.  He lied.

12   It turns out he lied on the stand.  He was asked a question

13   regarding his immigration process, and he then changed his

14   testimony, which then prompted the defense, and particularly

15   when the codefendant was severed out, to then file a motion

16   with Judge Brinkema and say, hey, we believe based on X, Y,

17   and Z that this witness lied, and we would like the

18   immigration file.

19           THE COURT:  You don't have anything that indicates

20   anything like that?

21           MS. AMATO:  No, not here.

22           THE COURT:  So explaining the difference with that case

23   is not necessarily helping your situation.  It's also true

24   that in that case there was a finding that there was a nexus

25   with the immigration process because the prosecution had been

1    involved with immigration by sending a letter to the
2    immigration judge noting that an order of removal would
3    complicate their prosecution.  We don't have anything
4    approaching those kinds of circumstances.
5        MS. AMATO:  I understand that.  And in the other case
6    that I cited, and a judge was not involved, it was just the
7    government, the prosecutors in that case who came forward with
8    the reaching out to ICE after I requested the immigration
9    files, and then they invited us to their office.  So there was
10   no judge or no order.  It was just basically like this case in
11   that regard, Your Honor.  And quite frankly, I mean, any
12   issues regarding potential misstatements, lies, that can be
13   brought out in impeachment is always relevant.
14       THE COURT:  All right.  Thank you.
15     Mr. Bonsib?
16       MR. BONSIB:  Thank you, Your Honor.  Your Honor,
17   counsel's motion was filed Friday.  I haven't filed a formal
18   motion to adopt.  I'd like orally to be able to join it, and
19   if necessary I can file an appropriate motion.
20       THE COURT:  I'll accept your oral joinder.
21       MR. BONSIB:  In this trial, I am sure that one of us is
22   going to be asking the cooperator about his immigration status
23   and whether he has filed anything, to use the court's time
24   frame, in the last 10 years, but more particularly anything
25   recently.

1        Now, maybe the answer is going to be no.  But if it's yes,

2   then we're now in the middle of trial, and knowing the kinds

3   of questions that are asked in applications for immigration

4   adjustment of status, my recollection is one of those

5   questions is, have you ever been involved in any criminal

6   activity.

7        It would be most interesting to have the answer to that

8   question if such a thing exists, and it seems to me it's very

9   simple for the government to simply make a call and say, are

10  there any pending immigration proceedings or applications with

11  respect to this individual, rather than leaving this issue

12  open.  And if the answer is no, then their belief becomes a

13  representation based upon investigation, not upon belief.  And

14  if the answer is yes, then we're entitled to it.

15       THE COURT:  I understand your position, but the problem

16  with your position is how broadly it casts.  Because what

17  you're saying is, in effect, the government has an obligation:

18  anytime they have a cooperator who may have some immigration

19  issues in the past or present, someone other than a native-born

20  U.S. citizen, anytime they have that kind of cooperator

21  they're obliged to go and check the immigration records.

22       I don't think you have any cases that would support that

23  breadth of position.  And I don't understand how this case is

24  any different than that multitude of cases that we see every

25  day in federal court where a cooperator is someone who is not

1    a native-born U.S. citizen.  And does the government have an

2    obligation to reach out to immigration authorities who are not

3    part of the Department of Justice and who have not had any

4    role in the prosecution team?  Does the government have an

5    obligation to reach out to them?  You're saying yes.

6        MR. BONSIB:  I'm saying under the facts of this

7    particular case, yes.  And the reason for that is the

8    government, as it has noted -- there is a real issue not just

9    about his immigration status but his status as relates to a

10   potential for wanting to stay in the United States because the

11   nature of this case would make it dangerous for him to go back

12   to his home country.  And so that makes it different than just

13   the general non-U.S. citizen who is a cooperator.

14       THE COURT:  Who doesn't want to go back to their

15   country but may not have as strong a reason for not wanting

16   to go.

17       MR. BONSIB:  But in this case the government has

18   already injected into this conversation, if I recall

19   correctly, the fact that maybe in the future there's going to

20   be some application for status based upon fear if he's

21   returned to his country.  So however that comes into play,

22   it's directly related to the specific facts of this case, and

23   it's not a general -- an argument that's just generally any

24   non-U.S. citizen, we're entitled to their immigration files.

25   So I think that's different.

1    And again, what's the problem with making a phone call?

2    They do it all the time.  If it was our witness, I can tell

3    you right now they'd probably be calling immigration

4    yesterday.  So this isn't like we're asking them to do

5    something that's out of the realm of the reasonable.

6    Thank you.

7        THE COURT:  All right.  If you want to respond to

8    Mr. Bonsib, I'll give you that opportunity.

9        MS. SEIFERT:  Sure.  How about the Privacy Act, which

10   protects all of these records?  Like, I can't just go get

11   whatever records from any other government agency.  I have to

12   actually go through a process to obtain those records.  And

13   here -- and it's either a subpoena or a *Touhy* request,

14   depending on the nature of the proceeding, and here I don't

15   have a basis to ask for those records.

16     I don't think they're relevant.  I don't think that they're

17   part of our case, and so what would be -- I don't have an open

18   grand jury.  So I don't think it's as easy -- I mean, I guess

19   I could issue a trial subpoena if I thought --

20       THE COURT:  Does *Touhy* apply to the government seeking

21   records from another part of the government?

22       MS. SEIFERT:  I cannot believe that it does, but I will

23   tell you --

24       THE COURT:  I don't believe it does either.

25       MS. SEIFERT:  Oh, well, well, Your Honor, I'm telling

1    you that the other agencies think that it does.  Look, we can

2    request files of individual name record files, right.  Those

3    individuals also have rights.  They also have protections over

4    those files.  Federal law provides those protections.  The

5    Privacy Act provides those protections.  So I have to -- I

6    have to explain to the agency why I get those files, right?

7    And here I don't have an explanation for that anyway.

8        I mean, if I wanted to go get files of the Social Security

9    Administration or the IRS, there's a process.  With the IRS, I

10   have to get an order from the court that those are relevant.

11   All of these files are individual files of, for instance,

12   the cooperating witness's family.  It has all of their PAI

13   information in it, it has all of their family history

14   information, it has their statements about why they were

15   immigrating to the United States.  I'm just not sure why those

16   are -- one, why they're relevant, and two, what authority, if

17   I don't think it's relevant to my case, why the government

18   would go ask for that file, right?

19       In any event, let's just go back to what Mr. Bonsib said,

20   which is that here the cooperating witness is going to

21   potentially in the future make an argument that they should be

22   allowed to stay in the United States because they cooperated

23   in this case.  What does the immigration file change about

24   their ability to cross-examine on that point?  They have the

25   plea.  That is literally what the plea says: You have given up

1    all your rights for all claims with the exception of a claim

2    under the Convention Against Torture.  They can inquire of the

3    witness, and he can say, I am scared, I'm not scared, yes, I'm

4    really scared of your client.  I mean, they do so at their own

5    peril as he points the finger at the two defendants and say

6    those are the people I'm afraid of.  But if they want to make

7    that inquiry, they can do that.

8        And in fact the government has disclosed the Jencks of this

9    witness that shows that he is fearful and all of the different

10   times that he's said he's fearful of the defendants.  So sure,

11   I imagine that if they ask that question, he'll say, yeah, it

12   was really hard for me to take that plea, I had to give up all

13   of my claims, and hopefully at the end of the day I can make

14   this one claim I have left.

15       But I don't know what the immigration file is going to do

16   to change or help their inquiry in any way.  I mean, they have

17   that information.  That's exactly what the government said in

18   our plea.  That's in the plea.  They have that as their way to

19   attack his credibility, and that's what they can use.  And

20   they also have his Jencks where he made those same claims.

21       THE COURT:  All right.  Thank you all.  I guess I'll

22   issue a ruling on this expeditiously, but not at this very

23   moment.  And with that -- I mean, I haven't seen --

24       MS. SEIFERT:  If I might just remind the court that the

25   plea itself remains under seal.  So to the extent the court is

1    referring to what's in the plea and the government's
2    representations today, I would ask the court seal those
3    portions.
4        THE COURT:  I will do so and appreciate the reminder.
5    With respect to the witnesses, I haven't seen the witness list
6    or the exhibit list, so I can't really deal with them.  Is
7    there anything anyone wants to raise with respect to the
8    witness list?
9      I don't think on the exhibit list that we really can
10   effectively deal with that, but if there's any problem that
11   anyone anticipates or wants to raise with me now, do so.
12   But that'll be the end of this proceeding unless someone
13   else thinks that there's something else we can address given
14   Mr. Germine's lack of presence here.
15       MR. ORENBERG:  Well, it's difficult to anticipate
16   any problems with the exhibit list until we actually see
17   the exhibits themselves, which I believe the government is
18   required to give us this coming Friday.
19       THE COURT:  I believe that's right.
20       MS. PASCHALL:  Thursday.
21       MR. ORENBERG:  Is it Thursday?  We'll take Wednesday.
22       MS. PASCHALL:  We will turn them over when the court
23   orders us to do so.
24       MR. ORENBERG:  Is it Thursday?  I apologize, I think
25   it's Thursday.

```
 1              THE COURT:  I think it's Thursday.  I think it's
 2      the 11th.
 3              MR. ORENBERG:  It's the 11th.  Thank you, Your Honor.
 4      So if there's any issues, we'll bring them up at the
 5      appropriate --
 6              THE COURT:  Well -- (overspeaking) -- closed.  I'm just
 7      asking if there's anything that anybody knows about now that
 8      it would be beneficial to raise with me.  Mr. Bonsib is ready
 9      to leave.
10              MR. BONSIB:  I have a different question of the court.
11              THE COURT:  Okay.
12              MR. BONSIB:  Just some of the logistics.
13         If I'm sitting down at the end there with my old eyes, I
14      cannot see any -- I noticed this at the last hearing.  I can't
15      see the exhibits.  Does the court have the ability to provide
16      a second monitor, or if not --
17              THE COURT:  I think so.  I think so.  We'll check on
18      that.
19              MR. BONSIB:  And during the course of --
20              THE COURT:  We'll call it the Bonsib edition.
21              MR. BONSIB:  A big one.
22         Your Honor, during the course of the trial, when objections
23      are made by one defense counsel, are they deemed by the Court
24      to be on the behalf of both so we don't both have to object,
25      or how does the court rule on that?
```

1          THE COURT:  I can deem them made by both -- there will

2     be some instances where it probably won't be by both, but I

3     think we can handle that.  Those will be more the exception.

4          MR. BONSIB:  Okay.  And that's fine.

5          THE COURT:  But I can imagine that there will be some

6     instances where there really isn't a basis for the other

7     defendant to have an objection.

8          MR. BONSIB:  I guess where applicable, then.  But in

9     any event, thank you, Your Honor.

10          THE COURT:  Okay.

11          MR. ORENBERG:  I have a housekeeping question, or

12     request, Your Honor.  Would the court be able to draft an

13     order -- or I could draft the order and issue an order to the

14     marshals to allow Mr. Bonsib, Ms. Amato, and myself to the

15     front of the line in the mornings when we're trying to enter

16     the courthouse?  As the court may well be aware, sometimes

17     there's 15, 20 people trying to get in through -- well, we do

18     have two entrances, but everyone seems to congregate on the

19     eastside entrance.

20          THE COURT:  Well, don't come tomorrow.

21       (Laughter.)

22          MR. ORENBERG:  Well, we know that, unless you order

23     us to.

24          THE COURT:  But I will say that next week there are I

25     think three or four jury trials that will be commencing, and

1    the following week, I believe on that Monday, there are eight.

2    So I don't know whether I can pluck you out and say you get to

3    the front of the line ahead of 30 other counsel.  Can I?

4            MR. ORENBERG:  It's been an ongoing problem.  I know

5    the government has permission to enter the courthouse in a

6    different method.  You know, it's something --

7            THE COURT:  They get helicoptered in, yes.

8            MR. ORENBERG:  -- that I've thought about many years,

9    having been a member of this court since the late 1980s -- and

10   I think Mr. Bonsib has also or shortly thereafter, and

11   Ms. Amato a long time also.  We're seasoned regulars here, and

12   we're just asking for some sort of, I guess, accommodation by

13   the court if there is going to be a bunch-up at the

14   magnetometers in the morning.  It's sometimes very difficult

15   to get through and get up here.  Even if we get here at 8:30

16   in the morning, I have stood in line for a half an hour, 40

17   minutes sometimes to get in.  As the court said, there's going

18   to be eight trials starting I think the last week of January.

19           THE COURT:  I think it could be a problem if all of

20   those eight trials go.  Sometimes some of them don't wind up

21   going, but if they all do go, it will be a busy place.  I will

22   think about that.

23           MR. ORENBERG:  Appreciate it.

24           THE COURT:  But I'll probably think about it by

25   consulting with one or two of my colleagues and see if we

1    really want to start the process of singling out, issuing

2    orders jumping counsel in cases to the front of the line.

3    That makes me a little bit uncomfortable, and if other judges

4    were doing that so that counsel before me were prejudiced by

5    them all being bounced in front of you, I would be a little

6    concerned.

7            MR. ORENBERG:  I mean, if I may --

8            THE COURT:  But I'll think about it.

9            MR. ORENBERG:  If I may, if I may offer an observation,

10   if Your Honor and the other judges who are going to be

11   starting trials next week would be able to adjust their start

12   times a little bit so it's not all at 9:30, that might be one

13   way to approach this potential logistical problem.

14           THE COURT:  That's hard to do because -- I mean, you

15   can adjust it a little bit -- I mean, you could start at nine

16   o'clock.  I'm not sure that's what you're looking for.

17           MR. ORENBERG:  No.  I prefer 9:30.  Or what Judge Leon

18   does, he starts at two o'clock.

19           THE COURT:  We don't have to talk about that.

20           MR. ORENBERG:  Okay.

21           THE COURT:  Okay.

22           MR. ORENBERG:  All right.  Thank you, Your Honor.

23           MS. AMATO:  Your Honor, I just wanted to add, I mean,

24   it ends up --

25           THE COURT:  These are the things that are important,

1    like parking places.

2        (Laughter.)

3        MS. AMATO:  I've had situations where I'm the only

4    person waiting in line because of course the government can go

5    through, and once the jury is selected, they get to go through

6    and they don't have to wait.  And so I mean, I'm the one who's

7    waiting, and of course we can't really start -- although in

8    this case we could start without me because there's two of us,

9    but I mean it has been a problem.  And then what does happen

10   is that sometimes the deputy clerk is able to call down to the

11   marshals and say, okay, do you have so-and-so in line --

12       THE COURT:  We do that on occasion.

13       MS. AMATO:  -- can you move that person to the front of

14   the line so that they can then go through, but --

15       THE COURT:  That's because you'd be keeping the judge

16   waiting.

17       MS. AMATO:  Sorry?

18       THE COURT:  That's because you would be keeping the

19   judge waiting.

20       MS. AMATO:  Well, yes.  Exactly.  The judge and

21   everybody else who was present including the jury.  So it's

22   unfortunate that they don't give us a badge that we can at

23   least walk through as well.  But anyway, so any help on that,

24   Your Honor, is appreciated.

25       THE COURT:  All right.  I instruct the government that

1    it may not inform the jury that Ms. Amato has requested that

2    she be bounced ahead of them in line.  You may not.

3        (Laughter.)

4        All right.  Anything else?

5            MS. SEIFERT:  Couple of things, Your Honor.  I just

6    wanted to note for the record the exhibit list -- excuse me --

7    the witness list which we did provide to defense today has the

8    true names of the individuals that we've asked for the court

9    that they can testify under pseudonym, and so obviously before

10   we would file that on the record we would need the motion

11   resolved.

12       Additionally, I have not heard from defense, but we have

13   one person whose family member, or spouse, had a recent

14   medical issue, open-heart surgery, so they're not able to

15   travel.  We've asked the defense to stipulate or in the

16   alternative to allow that person to testify remotely, and I

17   wanted to clarify whether, since we haven't heard, I can file

18   a motion with the court for remote testimony.  But I wanted to

19   clarify that the court has the ability to do remote testimony

20   now since Covid or whether I need to have that witness, if the

21   court granted my motion, show up at, I don't know, another

22   courthouse somewhere and be able to do a VTC that way?

23           THE COURT:  I think we can do remote testimony.  I

24   mean, it's not -- I'm not interpreting the rules in terms

25   of what's allowed and not allowed.

1          MS. SEIFERT:  Yes.

2          THE COURT:  But in terms of the technology, I believe

3    that we can do remote testimony without them having to go to a

4    courthouse or some other government facility.

5          MS. SEIFERT:  All right.  Well, I will ask defense

6    again after --

7          THE COURT:  That's what I would suggest.  See if you

8    can get resolution of that before you file a motion.

9          MS. SEIFERT:  Okay.  And otherwise, I'll file it

10   tomorrow, Your Honor.

11       And given the rise in Covid numbers, I did want to ask

12   whether it would be prudent to have a third alternate or if

13   you think that it's a short enough trial that that's

14   unnecessary?  Maybe the court will just take it under

15   advisement for now.

16         THE COURT:  I can think about that.  Any of you from

17   the defense on that?

18         MS. AMATO:  That makes sense.

19         MR. ORENBERG:  I agree.

20         THE COURT:  Just lengthens the jury selection because

21   we have to get more jurors.

22         MS. SEIFERT:  Only one.

23         THE COURT:  No, two more strikes.

24         MS. SEIFERT:  You're right.

25         MR. ORENBERG:  Since I was the one that sort of raised

1    the Covid discussion earlier in a different way, we have no

2    objection on behalf of Mr. Germine.

3            THE COURT:  All right.  I'm sorry?

4            MR. BONSIB:  Was someone looking to me for a response?

5            MS. SEIFERT:  I just wasn't sure if you had a chance

6    yet.

7            MR. BONSIB:  No, I'm okay.  I think it's a good idea.

8            THE COURT:  Okay.  Anticipate that I've accepted the

9    suggestion and that we'll have three alternates, and therefore

10   we will need 35 jurors and you'll each have two strikes for

11   alternates.

12           MS. SEIFERT:  Great.  And then the last -- I know the

13   court gave a little bit of a preview that it was going to be

14   working on instructions and we might be continuing to work on

15   those including into trial.  It is typically my practice in

16   opening statements to provide a statement to the jury about

17   the elements of the offenses, and while I don't know that we

18   need all of the objections resolved, when I look at the

19   defense's objections, some of them are I think pretty basic

20   things that I would be stating in the opening statements.

21       So, for instance, aiding and abetting liability, and then

22   also with respect to the ECRA offense, the defense has added

23   an overt act -- or excuse me, a substantial step as one of the

24   elements which we view is not the law.  And so I just was

25   wondering if the court can in some ways prioritize that part.

1          THE COURT:  I'll try to give you enough of a roadmap in
2     advance of your openings so that you can feel comfortable with
3     your reference to the elements of the charged offenses.
4          MS. SEIFERT:  Great.  Thank you, Your Honor.
5          THE COURT:  And indeed, in my preliminary instructions,
6     I usually have pretty limited but somewhat of an explanation
7     of the elements.
8          MS. SEIFERT:  I recall that.  That's great.  Thank you,
9     Your Honor.
10          THE COURT:  Mr. Orenberg.
11          MR. ORENBERG:  Since Ms. Seifert raised the issue of
12     opening statements, does the court have any guidance as to
13     time limits as we prepare our --
14          THE COURT:  What's your request?  My guidance is no
15     more than 10 minutes, but I'm not sure that's what you want
16     to hear.
17          MR. ORENBERG:  Well, let me see what --
18          (Counsel conferring.)
19          MR. ORENBERG:  Yeah.  I mean, Ms. Amato reminds me
20     that -- again, we're referring to Judge Brinkema -- ordered
21     ten minutes in a three codefendant case -- 20 minutes, excuse
22     me, for each side.
23          (Counsel conferring.)
24          THE COURT:  I assume that Ms. Amato is talking to you
25     and not to me, because I can't hear her.

1          MR. ORENBERG:  She's talking to me.

2       But anyway, as we prepare for our opening statement, does

3    the court have any guidance for the government and for us with

4    respect to length of opening statements?

5          THE COURT:  Sure.  I'll give you some guidance.  How

6    long does the government anticipate that it would like to have

7    for its opening?  I'm not going to hold you to this.

8          MS. SEIFERT:  Your Honor, I wasn't quite prepared to

9    answer that question today.

10          THE COURT:  I know.

11          MS. SEIFERT:  I've written my opening statement, but I

12    haven't had a chance yet to go through it with co-counsel and

13    with our management, and so I'd be more posed to answer that

14    question later in the week.

15          THE COURT:  More than 10 minutes?

16          MS. SEIFERT:  More than 10 minutes.

17          THE COURT:  Less than an hour?

18          MS. SEIFERT:  I have 47 counts, I think.  I'm counting

19    right now.

20          THE COURT:  I know there are a lot of counts.

21          MS. SEIFERT:  I think it might take more than ten

22    minutes.

23          THE COURT:  Less than an hour?

24          MS. SEIFERT:  I would hope so.  I ascribe to the homily

25    is always too long theory of opening statements.  So I'm happy

1    to do whatever I can to make it as short as possible.

2          THE COURT:  All right.  So figuring that the government

3    is going to do an opening statement between 45 minutes and an

4    hour, how long do you want, Mr. Orenberg, if it's you, or

5    Ms. Amato?  You raised the question.  You've made the bed.

6    You've gotta sleep in it.

7          MS. AMATO:  Without committing, since the government

8    has given a range, we'll say anywhere from 10 to 30 minutes.

9          THE COURT:  All right.  That sounds doable.

10   Mr. Bonsib?

11         MR. BONSIB:  30 to 45 minutes.

12         THE COURT:  All right.

13         MR. BONSIB:  That may be more than I need, but I'd

14   rather say that and not --

15         THE COURT:  I think those estimates are all on the

16   longish side, but they're all something that I will live with.

17      All right.  What else?

18         MS. SEIFERT:  I believe that's it from the government,

19   Your Honor.

20         THE COURT:  All right.  And from the defense,

21   Mr. Orenberg?

22         MR. ORENBERG:  Nothing further, Your Honor.

23         THE COURT:  All right.  And I will hear from you,

24   perhaps, in the near future.

25         MR. ORENBERG:  Yeah.  Hopefully, by five o'clock.

1          THE COURT:  All right.  Mr. Bonsib, anything else?

2          MR. BONSIB:  No, Your Honor.  Thank you.

3          THE COURT:  All right.  Thank you.  And --

4          MS. SEIFERT:  Your Honor, I guess I would just -- can

5     you clarify, is there something that we did not cover today

6     that the court wanted to cover today that we're going to need

7     to cover once we have Mr. Germine?

8          THE COURT:  No, no.  I think that we covered

9     everything.  I can't do anything with the witnesses.  Like I

10    haven't looked at your witness list to know whether you've got

11    six witnesses to testify to one thing, in which event I would

12    say that's cumulative; you've gotta cut those witnesses down

13    so you only have the usual three that the government puts on

14    to testify to the same thing.

15        So I haven't been able to do that because I haven't seen

16    the witness list.  So I haven't been able to go over the

17    witnesses in any meaningful way.  Any way at all.  So is there

18    more that we perhaps might have to do at some time right at

19    the beginning of the trial before we get going?  Perhaps, but

20    I'm not anticipating it.

21         MS. SEIFERT:  Okay.  Thank you, Your Honor.  And we're

22    happy to submit -- can we just email the clerk --

23         THE COURT:  I think that would be helpful.

24         MS. SEIFERT:  We obviously don't want to file --

25         THE COURT:  I think that would be helpful.  You can

1    email it to chambers.

2            MS. SEIFERT:  Okay.  And we can also provide our

3    proposed stipulations, which just for the court's reference

4    are of witnesses that we think we can stipulate to to prevent

5    the situation the court is referring to, which is cumulative

6    and unnecessary witnesses.

7            THE COURT:  Okay.

8            MS. SEIFERT:  So we'll send that, the exhibit list and

9    the witness list, to chambers.  Thank you.

10           THE COURT:  All right.  On the pseudonyms motion, the

11   defense has indicated that it needed some time to respond to

12   that.  And there is some time urgency, if you will.  It's not

13   a big issue, but when are you going to be able to file

14   anything that you will file on that?

15           MR. ORENBERG:  By Thursday, Your Honor.

16           THE COURT:  So that we can resolve it Thursday by one

17   o'clock on Thursday.  That's 1 p.m. on Thursday.

18           MR. ORENBERG:  East Coast time.

19           THE COURT:  Yes, sir.

20           MR. ORENBERG:  Okay.  Thank you.

21           THE COURT:  All right.  Let's get ourselves ready for

22   this trial.  It'll be an interesting trial, and I will get

23   something out on the immigration files issue.  But other than

24   that, I don't think you're waiting for anything from me, and

25   next time we are scheduled to be together will be on the

1    morning of trial, to begin with jury selection at 9:30 on

2    January 17.  All right.  Thank you all.

3         (Proceedings adjourned at 3:28 p.m.)

4


                         *   *   *   *   *

                            CERTIFICATE

         I, BRYAN A. WAYNE, Official Court Reporter, certify

    that the foregoing pages are a correct transcript from the

    record of proceedings in the above-entitled matter.




                        _/s/ Bryan A. Wayne_
                        Bryan A. Wayne